CECILIA M. ALTONAGA, UNITED STATES DISTRICT JUDGE
THIS CAUSE came before the Court on Plaintiff, Scottsdale Insurance Company's Motion for Summary Judgment [ECF No. 31] ("Pl.'s Mot.") and Defendant, Granada Insurance Company's Response in Opposition and Cross-Motion for Summary Judgment [ECF No. 35] ("Def.'s Mot."). Plaintiff filed a Reply to Defendant's Response to Plaintiff's Motion and a Response to Defendant's Cross-Motion for Summary Judgment [ECF No. 38] ("Pl.'s Reply"). Defendant filed a Reply to Plaintiff's Response [ECF No. 45] ("Def.'s Reply"). The Court has carefully considered the parties' submissions,[1] their exhibits, the record, Plaintiff's Complaint [ECF No. 1], and applicable law. For the following reasons, Plaintiff's Motion is denied and Defendant's Motion is granted.
I. BACKGROUND
This is a coverage dispute arising out of the duty to defend an underlying lawsuit alleging various construction defects. The facts are entirely undisputed.
On October 29, 2010, Eldorado Towers Condominium Association, Inc. ("Association") entered into a contract with Plaintiff's insured, National Concrete Preservation, Inc. ("National Concrete"). (See Plaintiff's Statement of Undisputed Facts [ECF No. 32] ¶ 1 ("Pl.'s SOFs"); see also Defendant's Response to Plaintiff's Statement of Facts [ECF No. 36] ¶ 1 ("Def.'s Resp. to Pl.'s SOF") ). National Concrete agreed to serve as the contractor for the repair and restoration of a pool, Jacuzzi, *1132 pool decks, clubhouse decks, and a garage area ("Project") for the Association's complex in Aventura, Florida. (See Pl.'s SOF ¶ 1).
Plaintiff issued three commercial general liability policies to National Concrete for the policy periods of January 12, 2011 to January 12, 2014. (See id. ¶ 4). Plaintiff's Amendment to Other Insurance Condition Endorsement provides National Concrete insurance that "is excess over any other insurance, whether primary, excess, contingent or any other basis." (Id. ¶ 5). Therefore, if there is a "valid and collectible insurance available ... under any other policy," Plaintiff has "no duty to defend ... the insured against any 'suit.' " (Id. (alterations added) ). Under Plaintiff's policies, "[i]f no other insurer defends, [Plaintiff] will undertake to do so, but [is] entitled to the insured's rights against all those other insurers. (Id. (alterations added) ).
In August 2011, National Concrete retained Rosmel Pools, Inc. ("Rosmel") to serve as one of its subcontractors on the Project. (See id. ¶ 8). Rosmel agreed to perform work and supply materials for the Project. (See id. ). In the contract, Rosmel stated it would endorse National Concrete as an additional insured and would designate its retained insurance as primary over any other insurance policy. (See id. ).
For its part, Defendant issued commercial lines policies that contained commercial general liability coverage to Rosmel for the policy periods of July 29, 2008 to June 20, 2013. (See id. ¶ 10). The July 29, 2010 to June 20, 2013 policies contain an Additional Insured - Owners, Lessees or Contractors - Scheduled Person or Organization Endorsement, which provides:
A. Section II - Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for ... "property damage" ... caused, in whole or in part by:
1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.
B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
This insurance does not apply to "bodily injury" or "property damage" ... occurring after:
1. All work, including materials, parts or equipment furnished in connection with such work on the project (other than service, maintenance, or repairs) to be performed by you or on your behalf for the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
(Id. ¶ 11; see also Commercial Line Policy [ECF No. 36-1] 61[2] ).
Defendant's policies issued to Rosmel also contain the following endorsement:
*1133 CLASSIFICATION LIMITATION ENDORSEMENT
THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:
Commercial General Liability Coverage part
Owners and Contractors Liability Coverage part
Products/Completed Operations Liability Coverage part
Coverage under this policy is specifically limited to those operations described in the declarations under "CLASSIFICATION SCHEDULE"
NO OTHER OPERATIONS BY THE INSURED OR BY ANYONE FOR WHOSE ACTIONS THE INSURED IS RESPONSIBLE ARE COVERED.
(Defendant's Additional Material Facts [ECF No. 36] ¶ 22; see also Response to Def.'s Additional Material Facts [ECF No. 37] ¶ 22 (emphasis in original) ).
A "products-completed operations hazard" in Defendant's policies is defined as:
16. "Products-completed operations hazard":
a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
1. Products that are still in your physical possession; or
2. Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
(a) When all of the work called for in your contract has been completed.
(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
(Commercial Line Policy [ECF No. 36-1] Section V ¶ 16). In contrast, an "occurrence" under the policy is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. ¶ 14).
In October 2015 - nearly five years after National Concrete and Rosmel began working on the Project - the Association filed a Complaint in the Circuit Court in and for Miami-Dade County, Florida, case no. 2015-023546-CA-01 ("Underlying Action"), against National Concrete, alleging claims of breach of contract and negligence. (See Pl.'s SOF ¶ 2). The Association filed multiple amended pleadings, concluding with a Fifth Amended Complaint, the final and operative pleading in the case. (See id. ¶ 3). The claims by the Association against National Concrete remained the same and the allegations regarding the Project generally remained the same in all pleadings. (See id. ).
The Association's operative Fifth Amended Complaint seeks damages for defects and deficiencies resulting from the 2010 Project. (See Def.'s SOF ¶ 23). The Fifth Amended Complaint [ECF No. 32-1] specifically alleges the following:
(1) In October, 2010, the Association entered into a contract with National Concrete for the repair and restoration *1134 of an elevated pool, Jacuzzi, pool decks, club house decks, and the garage areas beneath the pool decks at Eldorado.
(2) The 2010 Project was completed in 2012.
(3) In Count I, the Association alleges following the completion of National Concrete's work on the Project, the Association learned of and/or noticed various leaks, spalling, and rust stains below the pool deck at the Project.
(4) On May 9, 2016 and August 10, 2016, the Association sent National Concrete an Amended Notice of Claim and Supplemental Notice of Claim respectively, in accordance with Chapter 558, Florida Statutes.
(5) National Concrete breached the 2010 contract with the Association by performing defective work.
(6) In Count II, the Association alleges National Concrete was negligent and breached its duty of care by failing to make sure that the Association's pool, pool deck and garage were reasonably and adequately installed and/or were otherwise free of defects.
(See id. 3-6).
Plaintiff provided and continues to provide a defense to National Concrete for the allegations in the Underlying Action under a full and complete reservation of rights to later decline coverage for any damages not triggering coverage under the policies. (See Pl.'s SOF ¶ 7).
On September 26, 2014 and January 4, 2015, Defendant's independent adjuster sent a letter and follow-up letter to Rosmel stating Rosmel's defective work had caused residual leaks that damaged the concrete structure below. (See id. ¶ 12). The letters placed Rosmel on notice of the claim and demanded Rosmel provide a defense to National Concrete as an additional insured and contractual indemnitee. (See id. ). On July 2, 2015, Defendant sent a reservation of rights letter to the independent adjuster retained by Plaintiff declining to provide a defense to Plaintiff as an additional insured. (See id. ¶ 15).
National Concrete later filed Third-Party Complaints in the Underlying Action against Rosmel for common law indemnification, contractual indemnity, breach of contract, subrogation and negligence, alleging defects and deficiencies in Rosmel's scope of work on the Project, which resulted in property damage as defined in the policies. (See id. ¶ 16). In March and December 2017, Defendant reiterated it was declining to provide a defense and indemnity to National Concrete as an additional insured. (See id. ¶¶ 17, 19).
Plaintiff then filed this action in March 2018. (See generally Compl.). The Complaint seeks a declaratory judgment (see Count I) stating that Defendant's policy to Rosmel provides coverage to, including a duty to defend, National Concrete as an additional insured on a primary and non-contributory basis for the allegations in the Underlying Action. (See id. ¶¶ 31-39). Plaintiff also seeks damages for Defendant's breach of contract (see Count II) when it failed to provide a defense to National Concrete as an additional insured for the allegations in the Underlying Action. (See id. ¶¶ 40-45).[3]
As stated, both parties now seek summary judgment, asking the Court to determine whether Defendant owes a duty to defend National Concrete as an additional *1135 insured in the Underlying Action. (See generally Pl.'s Mot.; see also Def.'s Mot.).
II. LEGAL STANDARD
Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. See id. ; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. See Allen v. Tyson Foods Inc. , 121 F.3d 642, 646 (11th Cir. 1997). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. Anderson , 477 U.S. at 252, 106 S.Ct. 2505.
If there are any factual issues, summary judgment must be denied and the case proceeds to trial. See Whelan v. Royal Caribbean Cruises Ltd. , No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing Envtl. Def. Fund v. Marsh , 651 F.2d 983, 991 (5th Cir. 1981) ). Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." Id. (alteration added; citation omitted). Courts cannot weigh conflicting evidence, see Skop v. City of Atlanta, Ga. , 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co. , 802 F.2d 1352, 1356 (11th Cir. 1986) ), and "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed," United States v. Oakley , 744 F.2d 1553, 1555 (11th Cir. 1984) (alteration added; quoting Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co. , 512 F.2d 1017, 1023 (5th Cir. 1975) ).
III. DISCUSSION
At the outset, the Court identifies the undisputed premises underlying the parties' cross-motions for summary judgment.
The parties agree the subcontract between Rosmel and National Concrete required Rosmel to obtain commercial general liability insurance coverage and include National Concrete as an additional insured on a primary basis. (See Pl.'s SOF ¶ 5; see also Def.'s Resp. to Pl.'s SOF ¶ 5). The parties also agree that National Concrete's policies with Plaintiff provide that Plaintiff's policies are excess over any other insurance that is valid and collectible. (See id. ). The parties do not dispute that (or at least do not brief whether) the allegation in the Underlying Action that National Concrete's (and by extension, Rosmel's) defective work caused damage to the Project, is an "occurrence" of "property damage" under Defendant's policies to Rosmel. (See Pl.'s Mot. 5; see also Def.'s Reply 2, 5). The parties therefore do not dispute that Defendant owes National Concrete a duty to a primary and non-contributory defense as an additional insured, barring the application of any exclusions in Defendant's policies to Rosmel.
These agreements lead to the single issue on which the parties depart: whether any exclusions in Defendant's policies to *1136 Rosmel apply. If an exclusion applies, Defendant does not owe National Concrete a duty to defend in the Underlying Action. If an exclusion does not apply, Defendant owes National Concrete a duty to defend it as its additional insured.
Because the Court concludes the completed-operations hazard exclusion in Defendant's policies bars additional-insured coverage for the Association's claims against National Concrete in the Underlying Action, the Court does not venture into the application of any other exclusion. The principles compelling this conclusion are explained below.
A. The Parties' Briefing
Plaintiff's argument is straightforward. Plaintiff asserts the Fifth Amended Complaint in the Underlying Action does not specifically allege whether the property damage occurred during Rosmel's ongoing operations or during the products-completed operations hazard - after Rosmel's work was completed. (See Pl.'s Mot. 11-12). Because the property damage may have occurred during Rosmel's ongoing operations, Plaintiff asserts Defendant owes National Concrete a duty to defend as an additional insured. (See id. (citing cases) ).
Defendant states the argument is "misplaced," as it "wholly misses the temporal distinction between ongoing and completed operations hazard coverage." (Def.'s Mot. 6). According to Defendant, the completed operations hazard exclusion bars coverage to an additional insured "for damage that occurs after the named insured has left the job." (Id. (emphasis in original) ). Defendant points out (1) the 2010 Project was completed by 2012 and (2) the Association alleges in the Underlying Action that following completion of the Project, the Association learned of and noticed various leaks, spalling, and rust stains. (See id. 6-7). It was not until 2015, three years after the 2010 Project was completed and put to its intended use, that the Association filed the Underlying Action. (See id. 7). To Defendant, these circumstances "clearly make[ ] the claim at issue a completed operations hazard and therefore preclude[ ] National Concrete from qualifying as an additional insured under the policies." (Id. (alterations added) ).
Plaintiff nevertheless insists that "whether the damages were discovered and the Complaints were filed after the work was completed has no bearing on when the property damage caused by Rosmel's allegedly defective work began." (Pl.'s Reply 5). Plaintiff explains Defendant's duty to defend, under Florida law, is triggered not when property damage is manifested or discovered, but rather when property damage actually takes place. (See id. 5-12 (citing cases) ). Consistent with the injury-in-fact trigger, Plaintiff argues because the property damage "may have begun during Rosmel's ongoing operations for National Concrete, ... trigger[ing] coverage to National Concrete as an additional insured," the completed-operations hazard exclusion does not apply. (Id. 10 (alterations added) ).
Defendant responds in kind, assuring the Court it is "not arguing in favor of a trigger theory in the slightest." (Def.'s Reply 2). Defendant is not contesting whether there was an "occurrence" under Defendant's policies, that is, whether damage might have "occurred" during the policy period. (See id. ). Rather, Defendant contends even if there was an "occurrence" to trigger threshold coverage, the plain meaning of the completed-operations exclusion provision precludes coverage. (See id. 5).
In making this argument, Defendant relies on the plain meaning of its policies. Because the definition of completed operations "focuses on the state or timing of the completion of the work" and not the "timing *1137 of damages," Defendant states Plaintiff's emphasis on damage trigger theories is misplaced. (Id. 2). Defendant states the completed-operations hazard exclusion is unequivocally clear. (See id. ). Given "the timeframe after the work its insured performed at the job site was completed and the Project was put to its intended use," the products-completed operation hazard exclusion precludes Defendant's coverage to National Concrete as an additional insured. (Id. (emphasis omitted) ).
B. Applicable Law & Analysis
"The construction of insurance contracts is governed by substantive state law," which the parties agree is Florida law. Provau v. State Farm Mut. Auto. Ins. Co. , 772 F.2d 817, 819 (11th Cir. 1985). Under Florida law, "[t]he duty to defend must be determined from the allegations in the complaint." Jones v. Fla. Ins. Guar. Ass'n, Inc. , 908 So.2d 435, 443 (Fla. 2005) (alteration added; citations omitted). In other words, the duty to defend "is determined solely by the allegations against the insured, not by the actual facts, nor the insured's version of the facts." Irvine v. Prudential Prop. & Cas. Ins. Co. , 630 So.2d 579, 579-80 (Fla. 3d DCA 1993) (citation omitted).
While the Florida Supreme Court has not resolved the specific question before the Court, it has addressed the general applicability of completed-operations hazard exclusion provisions. See Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co. , 913 So.2d 528, 532 (Fla. 2005). Just as with any other policy provision that is clear and unambiguous, a completed-operations hazard exclusion "should be enforced according to its terms...." Id. (internal quotation marks and citation omitted; alteration added). Indeed, in determining whether the exclusion applies, "the language of the policy is the most important factor." Id. at 537. Finally, relying on the plain language of the exclusion does not "create gaps in coverage" because insurers can choose to "offer optional ... completed operations hazard coverage." Id. at 538 (alteration added; citations omitted).
The Court must therefore turn to the text of the completed-operations hazard exclusion in Defendant's policies to Rosmel. As noted, the policies do
not apply to "bodily injury" or "property damage" ... occurring after:
1. All work ... to be performed by you or on your behalf for the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use ....
(Pl.'s SOF ¶ 11; see also Commercial Line Policy, 61 (alterations added) ).
Again, the "Products-completed operations hazard" in Defendant's policies is defined as:
[A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
* * *
2. Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
(a) When all of the work called for in your contract has been completed.
* * *
(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor *1138 working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
(Commercial Line Policy, Section V ¶ 16 (alterations added) ).
Aerothrust Corporation v. Granada Insurance Company is instructive in ascertaining the meaning of Defendant's completed-operations hazard exclusion provision. See 904 So.2d 470 (Fla. 3d DCA 2005). There, a contractor inspected and maintained hoists located at the plaintiff's facility. See id. at 471. Five months after the inspection, the plaintiff was using one of the hoists that had been inspected to lower a jet engine, when the hoist failed and the engine was dropped and damaged. See id. The plaintiff paid the engine's owner for the damages, and then sued the contractor to recover what it had paid, alleging the contractor failed to properly inspect and ensure the proper type of bolt and nut were used on the hoist. See id. The contractor's insurer then filed an action to determine its duty to defend. See id.
The defendant-insurer argued it had no duty to defend because its insurance policy with the contractor contained a completed-operations exclusion. See id. at 471. The policy defined a completed operations hazard as all property damage occurring away from the insured's premises arising out of the insured's work except "[w]ork that has not yet been completed or abandoned." Id. at 471-72 (alteration added).
Relying on the plain language of the provision, the court agreed with the insurer. See id. at 473. Because the damages that plaintiff alleged the contractor caused "resulted from the work that [the contractor] completed five months prior to the accident," the completed operations exclusion barred coverage. Id. (alteration added). In sum, even though the owner of the facility argued the contractor's defective work was caused before completion of the project, and thus occurred during the policy period, the completed operations hazard exclusion barred coverage because the contractor had completed the project and the owner had put the hoist to its intended use. See id.
Plaintiff argues Aerothrust is distinguishable because unlike the Association's requested damages in the Underlying Action, which may have occurred during Defendant's policy periods, the damaged engine in Aerothrust necessarily occurred after the insured's policy period. (See Pl.'s Reply 6). The distinction does not yield a contrary result here. The Aerothrust court relied not on whether the jet engine was actually damaged before or after the policy period; rather, the court expressly emphasized the contractor's completion of the project and the fact the owner had put the hoist to its intended use five months before the accident.
Auto-Owners Insurance Company v. Marvin Development Corporation is even more illuminating. See 805 So.2d 888 (Fla. 2d DCA 2001). There, the underlying complaint involved allegations arising from a 1988 building agreement with a developer that was constructing a family residence. See id. at 890. The residents took possession of their home in May 1989, after construction was completed. See id. Cracks appeared in 1993. See id. The owners learned the house was situated on pockets of debris which, as the debris decomposed, caused settling and deterioration of the house. See id. The owners claimed the developer should have known the debris was buried under the lot and made the lot unsuitable as a home site. See id. The defendant-insurer acknowledged it insured the developer under commercial general *1139 liability policies but sought a declaratory judgment that the damages claimed by the homeowners were not covered by the policies. See id. Specifically, the insurer contended the completed operations hazard eliminated coverage for claims of property damage arising after the developer completed its work. See id. at 891.
The court agreed with the insurer that the completed operations hazard exclusion precluded coverage. See id. at 892. The court rejected the developer's argument that the completed operations exclusion did not apply because the negligence "occurred before its construction work was completed, and the physical damage to the property occurred during the policy period." Id. at 891. The court explained the nature of the homeowner's underlying claim was "akin to a claim that [the developer] failed to warn about existing defects or that [the developer] breached an implied warranty with respect to the fitness of the property." Id. at 892 (alterations added; citation omitted). "[I]n light of the allegations made by the [homeowners] in their underlying complaint," the exclusion applied because the property damage occurred after the developer "completed construction of the residence." Id. (alterations added).
Defendant is correct in relying on Auto-Owners . The decision was not predicated on when the damage to the property might have conceivably occurred , as Plaintiff now urges the Court to accept. The homeowners' underlying allegation in Auto-Owners was that while they "later learned that the house was situated on pockets of debris," the developer should have known the debris buried under the lot made the lot unsuitable as a home site. Id. at 891. The damage - the debris buried under the lot - was a preexisting one caused by the contractor, and over time materialized in the form of cracks on the property years later. The relevant temporal period therefore was not when the damage might have been caused; rather, the relevant period was when the contractor had completed its work and the homeowner had put the residence to its intended use.
A federal court in this District has adopted this reading of the completed-operations hazard exclusion. In Atlantic Casualty Insurance Company v. LTA Distributor, LLC , the defendant, a tire distributor, inspected and approved tires that were later purchased by the driver of a vehicle. See No. 14-22788-CV, 2015 WL 3466256, at *2 (S.D. Fla. June 1, 2015). The driver alleged that three months after the tires were purchased and installed, she lost control of her vehicle, causing bodily harm to others. See id. A duty-to-defend suit arose to determine whether the completed-operations hazard exclusion in the tire distributor's commercial liability insurance with the plaintiff-insurer barred coverage. See id. The court made the following pertinent observation, equally applicable here:
The work that was to be performed by New Life was performed - a tire was selected and placed on the vehicle. Ms. Payne's vehicle left the job site and the tires were put to use by Ms. Payne.... Thus, the work was completed but in an allegedly negligent fashion because the tire chosen by New Life was negligently selected. This is not the same as uncompleted work.... Moreover, the tire was put to its intended use - Ms. Payne drove on it for three months. Under the terms of the policy, work is deemed completed when the work done at a job site "has been put to its intended use." Thus, under the terms of the policy, the Insureds' work was completed and falls within the Products-Completed Operations Hazard Exclusion.
*1140 Id. at *4 (internal citation omitted; alterations added). The court rejected the argument that the completed operations hazard exclusion conflicted with the meaning of an occurrence under the policy. The "Products - Completed Operations Hazard Exclusion is a coverage portion of the policy, which specifically excludes certain types of accidents from coverage." Id.
When assessing completed-operations hazard exclusions similar to the one in Defendant's policies with Rosmel, the relevant timeframe under Florida law is when the project is completed, and not when latent damage may have occurred. Where a latent defect might have caused damages during the policy period, but the damage materializes after a project is complete and the site or product is put to its intended use, the completed-operations hazard exclusion bars coverage.
The Association's operative Fifth Amended Complaint seeks damages for defects and deficiencies arising from the 2010 Project. (See Def.'s SOF ¶ 23). The Fifth Amended Complaint alleges that around October 2010, the Association entered into a contract with National Concrete for the repair and restoration of an elevated pool, Jacuzzi, pool decks, clubhouse decks, and the garage areas beneath the pool decks. (See id. ¶ 14). The Association alleges the 2010 Project was completed in 2012. (See id. ¶ 15). The Association alleges following the completion of National Concrete's work on the Project, the Association "learned of and/or noticed various leaks, spalling, and rust stains below the pool deck at the Project." (Id. ¶ 26). Because the preexisting defects allegedly did not materialize until after the Project was completed and turned over to the Association to put the site to its intended use, the completed-operations hazard exclusion applies.
Courts outside Florida also lend support to this conclusion. For example, the Fifth Circuit recently held the same in interpreting Mississippi law. See Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co. , 743 F.3d 91 (5th Cir. 2014). The court noted that "logically, [ ] liability for construction defects arises out of a subcontractor's completed operations." Id. at 101 (alteration added; citing cases). But the court rejected the same theory now urged by Plaintiff because it would lead to the untenable conclusion that "a project owner could assert a breach of contract claim against a contractor for any error made during the course of construction, notwithstanding that the contractor might correct the problem before completing the project." Id.
Even though "liability for construction defects [is] created during ongoing operations, [it] legally arises from completed operations." Id. (alterations added). In sum, "[e]ven accepting the ... factual finding that damage had occurred during ongoing operations , the only 'damage' supported by allegation is the construction that was not in conformity with plans and specifications[,]" and "[l]iability for such damages arises out of completed operations, for which [the plaintiff] was not an additional insured under the policy." Id. at 102 (alterations and emphasis added).
The rationale behind the decision in Carl E. Woodward, L.L.C. is sound. Were the Court to adopt Plaintiff's theory, Defendant would be perpetually required - under a purely ongoing operations policy with Rosmel - to provide coverage to additional insureds, for any latent damages arising from defective work which may have occurred during the policy period. It would be of no moment that a subcontractor completed its work, turned it over to the contractor, and the contractor turned over the final work-product to the owner, *1141 who put it to its intended use. Such a reading would effectively nullify the difference between commercial general liability policies that provide coverage for completed-operations hazards and those that do not. The Court is required to read all provisions in Defendant's policies in harmony, and give full effect to the completed-operations exclusion provision. See Shelby Mut. Ins. Co. v. LaMarche , 371 So.2d 198, 200 (Fla. 2d DCA 1979), approved, 390 So.2d 325 (Fla. 1980) (favoring an interpretive method that reads the insurance policy "as a whole and the provisions given their express and harmonious meaning and effect").
The Seventh Circuit has also reached the same conclusion in interpreting Illinois law. See Nautilus Ins. Co. v. Bd. of Directors of Regal Lofts Condo. Ass'n , 764 F.3d 726, 730 (7th Cir. 2014). Finding that an identical completed-operations hazard exclusion provision barred coverage, the court noted the "residents had moved their personal property in the condominium units" and that fact "unambiguously establishes that the intended use had begun by the time any destruction of personal property occurred because of the water leakage." Id. at 735.
So, too, here Plaintiff does not dispute the Association's condominium complex was complete in 2012 and put to its intended use. The damages arising from Rosmel's construction defects materialized years later, when the Association learned of the faulty workmanship; those damages unambiguously fall within the completed operations hazard. Defendant therefore does not owe a duty to defend National Concrete as an additional insured.
Plaintiff's reliance on trigger theories is misplaced. Both Trizec Properties, Inc. v. Biltmore Construction Company, Inc. , 767 F.2d 810 (11th Cir. 1985), and Carithers v. Mid-Continent Casualty Company , 782 F.3d 1240 (11th Cir. 2015), involve the appropriate trigger theory for determining whether property damage "occurs" during a policy period. See id. As the Eleventh Circuit recently put it in Carithers , the plain language of the policy triggers coverage when property damage occurs and, in turn, property damage occurs "when the damage happens, not when the damage is discovered or [is] discoverable." Carithers , 782 F.3d at 1247 (alteration added).
That Florida may be an injury-in-fact jurisdiction is immaterial to whether a completed-operations hazard exclusion provision applies. Whether there is an "occurrence" under a policy is a threshold question used to determine whether damages occur during a policy period. That coverage falls within a policy period does not negate the application of an exclusionary provision. And again, Defendant does not dispute the Association's damages may have occurred during the policy periods contained in Defendant's policies to Rosmel.
Plaintiff essentially asks the Court to subsume trigger theories, used to define "occurrences" in commercial general liability policies, within the meaning of the completed-operations hazard exclusion. This, the Court will not do. No binding authority supports Plaintiff's novel theory. To the contrary, courts have treated the two as the distinct questions they are. See First Coast Energy, LLP v. Cincinnati Ins. Co. , 227 F.Supp.3d 1282, 1288 n.5 (M.D. Fla. 2017) (noting that although an injury-in-fact trigger is likely appropriate in determining what constitutes an occurrence, because the damages "are excluded under the policy's 'Exclusion - Products - Completed Operations Hazard' endorsement, it is not necessary for the Court to address this argument."); J.S.U.B., Inc. v. U.S. Fire Ins. Co. , 906 So.2d 303, 309-10 (Fla. 2d DCA 2005), approved, *1142 979 So.2d 871 (Fla. 2007) (rejecting the insurer's threshold contention the policies do not provide coverage for the builder's claims and then proceeding to "consider the pertinent exclusions contained in the policies," including the completed-operations hazard exclusion and their impact on the claims); Taurus Holdings, Inc. , 913 So.2d at 531 n.1 ("assum[ing] for purposes of our discussion that the complaints allege bodily injury that would be covered absent the products-completed operations hazard exclusion." (alteration added) ).
Travelers Property Casualty Company of America v. Amerisure Insurance Company , a case on which Plaintiff extensively relies (see Pl.'s Reply 10), does not support Plaintiff's position. See 161 F.Supp.3d 1133 (N.D. Fla. 2015). There, the insured had both ongoing operations and completed-operations coverage. See id. at 1138. The court's analysis was therefore limited to "whether the state-court complaint alleged an occurrence within the policy period. " Id. at 1137 (emphasis in original). True enough, the court adopted the Eleventh Circuit's holding in Carithers that the injury-in-fact trigger applied. See id. at 1138. But the court did so in concluding that the damage occurred during the policy period, either after completion of the work or while the work was ongoing. See id. at 1138. Travelers Property Casualty is therefore inapposite as it is does not even involve a policy with a completed-operations hazard exclusion.
Moreover, if Plaintiff's theory held any water, the Fifth Circuit's decision in Carl E. Woodward would have been based on state law that followed the manifestation trigger - when property damage is discovered. See 743 F.3d 91. But that is not the case. Again, the Fifth Circuit held that latent construction defects, the damages of which materialize and are known after a project is completed and put to its intended use, necessarily arise from completed operations. See generally id. That determination was based on the Fifth Circuit's construction of Mississippi law, which is also an injury-in-fact jurisdiction, not a manifestation trigger jurisdiction. See Travelers Indem. Co. v. Forrest Cty. , 206 F.Supp.3d 1216, 1224 (S.D. Miss. 2016) ("Absent a policy provision stating that multiple injuries occurring over a course of time must be treated as one injury occurring at a single point in time, the Court elects to treat multiple injuries over time as independent triggers at various points in time.").
The Court also notes Plaintiff's theory, even if logically sound, assumes Florida courts would apply an injury-in-fact trigger in every case. That is not what the Eleventh Circuit held in Carithers . Rather, the Eleventh Circuit carefully circumscribed the holding to its facts. See Owners Ins. Co. v. Superior Framing, Inc. , No. 6:15-cv-1178-ORl-22GJK, 2017 WL 3668772, at *12 (M.D. Fla. Feb. 21, 2017) (reviewing Carithers and noting that "[n]otwithstanding the lack of clarity in this area of Florida law, the Court can analyze without deciding which specific theory applies...." (alterations added) ).
Indeed, the Eleventh Circuit recognized the "difficulty that may arise ... where the property damage is latent, and is discovered much later." Carithers , 782 F.3d at 1247 (alteration added). Because "the district court found ... the property was damaged in 2005," the Eleventh Circuit "limit[ed] [its] holding to the facts of this case, and express[ed] no opinion on what the trigger should be where it is difficult (or impossible) to determine when the property was damaged." Id. (alterations added). Therefore, the Eleventh Circuit "only h[e]ld that the district court did not err in applying the injury-in-fact trigger in *1143 this case. " Id. (alteration and emphasis added).
Finally, the Court is not persuaded by the other cases on which Plaintiff relies. (See generally Pl.'s Mot; see also Pl.'s Reply). Those cases involve non-Florida courts interpreting the meaning of an occurrence under a commercial general liability policy, or resolving disputes over policies that do not contain completed-operations hazard exclusions, or some combination of the two.
The Court appreciates the need to err on the side of finding a duty to defend. But here the plain meaning of Defendant's policies and the applicable case law require entry of summary judgment in Defendant's favor. The completed-operations hazard exclusion in Defendant's policies to Rosmel unambiguously applies. As such, Defendant does not owe a duty to National Concrete as its additional insured.
IV. CONCLUSION
For the foregoing reasons, it is
ORDERED AND ADJUDGED that Plaintiff, Scottsdale Insurance Company's Motion for Summary Judgment [ECF No. 31] is DENIED . Defendant, Granada Insurance Company's Cross-Motion for Summary Judgment [ECF No. 35] is GRANTED . Plaintiff has a duty to defend National Concrete in the underlying action pending before the Circuit Court in and for Miami-Dade County, Florida, No. 2015-023546-CA-01. The Clerk of Court is directed to CLOSE the case. Final judgment will be entered by separate order.
DONE AND ORDERED in Miami, Florida, this 5th day of February, 2019.

Consistent with the December 21, 2018 Order (see [ECF No. 66] ), the undersigned has reviewed Defendant's Notices of Supplemental Authority (see [ECF Nos. 31, 41] ). The Court's disposition on summary judgment does not rest on Defendant's supplemental authorities; the Court instead relies on the parties' extensive briefing and its own independent research.

The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

Plaintiff "is not seeking indemnity from [Defendant] at this time as it is premature" but "reserves the right to bring an action seeking indemnity against [Defendant] in a separate action or amend th[e] Complaint to add claims for indemnity." (Compl. 20 n.2 (alterations added) ).